23.566. Thank you. Thank you very much. Council. Good morning. Good morning, Your Honors. May it please the court. David Harrison on behalf of Relators Michael Pilot and Philip Maniscalco. Under Rule 9b, the False Claims Act typically requires Relators to submit particularized facts alleging the submission of specific false claims including invoice numbers, invoice dates, and amounts billed, among other things. But in United States, X-Rail, Chorches v. American Medical Response, Inc., an exception was created for Relators who do not have access to this information. Hold on a second. Stop the clock, please. Please turn off your phones if you're in the audience. Thank you. Council, you can proceed. Thank you. An exception was created for Relators who do not have access to this information and thus would be unable to pursue otherwise meritorious ketamine suits that expose fraud against the government. As the court in Chorches put it, it is not the purpose of Rule 9b to render the FCA toothless as to particularly clever fraudulent schemes. And thus, where Relators can allege, one, plausible allegations that invoices actually submitted to the government were uniquely within the defendant's knowledge and control, and two, specific facts supporting a strong inference of fraud if sufficiently alleged to claim under Rule 9b. Council, can I ask, do you actually allege lack of access and where? We do, Your Honor. So both of the Relators, we allege that they do not have access. With respect to Philip Maniscalco, he was a remotely stationed therapist. He did not have access to nor did he. I'm not sure that it follows. It may be your argument. There's an inference available. But I would think you would allege lack of access and substantiate that by saying things like because it was remote, you couldn't get access. I mean, in Chorches, you've got this sort of physical description. You have a specific allegation of a lack of access. And then you've got these sort of specific descriptions about physical barriers to a billing department. And I just – I mean, I've got the relevant allegations from the complaint in front of me. I'm not sure I see actually a specific allegation of lack of access. You, of course, do allege the conclusion that they were particularly within the defendant's knowledge. But what paragraph would you point to to say lack of access and that the remoteness means lack of access? Yeah, so if I might just briefly touch upon Torches, which I think – Well, why don't you answer the question first? So what we allege in the complaint is that Philip Maniscalco had to submit his treatment forms to remotely stationed coders and that the billing procedures happened in states outside of New York at their corporate headquarters and other remotely stationed places across the country where these coders independently made determinations about patient care, separate and apart from the decisions and diagnoses that related to Maniscalco. And is there something you want to point to, a paragraph you want to point to? I mean, it seems to me the relevant paragraphs are 154 and 155 that says there was a lack of access. And because it was remote, there was no access. I mean, we all worked remotely for some period of time and we all had access to things. So I guess I'm just wondering where you specifically say there's a lack of access and sort of substantiate that by saying there's a remote. I mean, you say things like the billing department worked quietly. I don't know how that pertains to lack of access. So which paragraph and what words do you use to say that there's a lack of access? Again, I see you allege that it's remote and I see you allege that the forms were peculiarly within Amadeus' knowledge, which is the conclusion. But where does it say that your clients didn't have access? Is there a paragraph that you want to point me to? It's our position that those paragraphs support that conclusion. Those are the paragraphs you're relying on. Correct. To show that the relators here, your clients, could not have had access to the billing records except under very specific circumstances that you also set out or the complaint sets out here. Is that correct? That's correct. And I think it also relates to the broader context of how the procedures were implemented here with respect to- Does the lack of access to the billing records that would then trigger the application of torches, does that have to be- let me ask it more broadly. What's the standard with respect to alleging that? So under torches you had similarly remotely stationed EMTs who did not have access to an administrative building in which billing was conducted. The relators in torches or the relator in torches did not allege that the withholding or concealment was intentional. It was only that they didn't have access to a building where billing was conducted. What puzzles me about that, even in torches, but especially in this situation, is it strikes me that the physical space is kind of irrelevant to how I'm guessing the billing happens, which is digitally through a computer system. And so I know there's not an allegation that says this. I'm wondering if you had leave to amend, would you be able to plausibly allege that your clients don't have digital access to the billing records that would support their claims through an electronic case management system of some sort? Well, that's precisely correct. And that did come up in our discussion in preparation for this argument, that practically speaking, these were all done electronically. How else could they work remotely? Correct. And the physical access was, from our perspective, not particularly relevant as much as just the inability to have access to the information. My sense is that, to follow up on Judge Robinson's question, my sense is that these different members of the billing department, if that's the correct term, were desperately located. Is that correct? That's correct. But that's not in here. Is that specifically a legend here? There are allegations in the complaint regarding Mr. Maniscalco's required procedure to submit his therapy forms to coders that were scattered throughout the United States. We identified specific states. So did that come up? That is in connection with the motion to dismiss. Did this issue of the adequacy of the allegations relating to the access to the billing records, and therefore the application of torches, did that come up prior to the decision from the district court judge? Or was this a total surprise? It was not a total surprise. I mean, the adequacy of the allegations were raised in the context of the motion to dismiss briefing. The decision rendered by the court below, as you probably know, hung upon Philip Maniscalco's access to his own treatment forms that were altered by some of these remote stations. But did this broad issue of the adequacy of the allegations relating to the access to the billing records, did that come up? Not in the district court's opinion. But it was in the motion to dismiss. It was part of- And then you amended in the face of that motion to dismiss. We did. So this represents an already amended allegation related to access? The allegations with respect to access were not amended, but they were amended in response to an initial motion. So my question is, if you had leave to amend, what would you say? What would you allege on a good faith basis? Well, I think as Your Honor indicated, I think we could allege that we did not have access to the electronic medical or billing records that would have allowed us to allege specific details about the false claims that were submitted. I don't think that actually changes the analysis, but certainly it could be made part of the complaint. One of the points that you all just discussed was that the district court hung its hat in part on, aha, your guy said he saw some of his forms after they'd been changed. That suggests he does, in fact, have access. What would you say in an amended complaint to explain what is it that he did have access to that enabled him to see his altered forms as distinguished from what he didn't have access to? Or what was it about those particular altered forms that was somehow unique relative to the overall structure of the information flow? So I think that was simply a misunderstanding of the allegations in the complaint. Right, so how would you explain it in your amended complaint? I think the allegations could be slightly clarified. What we do state in particular paragraphs is that the forms that were altered came back from the billing department. So I think it was understood that those forms represented the actual bills or- Can I drill down a little bit on that? Yeah. When you say came back from, I'm still trying to understand how the underlying information flow works. Did they come back in the mail? Did someone hand deliver them? Or was there digital access to those forms? There was digital access to the forms, but these were the relator who was a therapist, his own treatment forms. Right, so does he have access to all his treatment forms to the extent that they're changed? Not the billings that are generated from the forms, but the treatment forms. He has access to his own treatment forms. So any allegations that involve altering information in the treatment forms would be readily accessible to the relator. But allegations involving alleged fraud that occurred in the billing stage that left intact the medical record wouldn't. Is that- That's correct. I mean, the forms themselves were converted to bills. Our relators have absolutely no idea what's in those bills. They don't know how they're created. They don't know how they're submitted to the government. They don't know what's in them or when they're submitted or who's processing them. That's part of the issue here, and I think that's what Chorch's gets at, which is to say that if you do not allow clinical individuals who do not have access to that information inadvertently or advertently, as the court in Chorch's said, you kind of gut the False Claims Act because those are the people that are going to know whether or not, for example, in this case, particular treatments are being fabricated. Conversely, if you have a billing department that's completely separate from the clinical side, those folks are not going to have any information related to medical necessity or homebound status. Just to follow up again, the form that came back electronically, as you've now said, can you explain how you would amend to- how you would explain that context? The only thing we would do is clarify, I think, the allegations related to that particular issue. So then how would you do that? I think that some of the language, candidly, is what- The what? The language in the complaint potentially led the court to believe that the information that was being sent back to the relator was information related to bills. It was just his own information. But to-I mean, you said a moment ago that the records of the billing department are completely separate. But here we have a record that went to the billing department, and yet your clients do have access to it. And so how would you explain-no? Sorry. Those are not billing records. Those are just treatment forms. They are- But do I understand? So the treatment form went to the billing department, and then somewhere in the billing department it was changed, and then your client saw that and said, oh, this is changed, and so we can infer it was changed. More specifically, it went to these coders who were part of the billing department. They were sort of liaising between the therapist and the billing department. But the coders are part of the billing department. The coders are part of the billing apparatus at Emeticis. And so how specifically would you allege that your client was able to see those forms that had been changed in the billing department? I think what's important is that the forms are not the bills, right? And I think that's what- That's not answering the question. So maybe you wouldn't change-but I'm trying to understand how forms that went to the billing department, not bills, and were changed by coders in the billing department, still not bills, were accessible to your client. Our client was treating those patients. So, for example, if my client said this person should be treated for two days a week for six weeks, as an example, and was fairly independent, and that was submitted by our client after he had seen the patient face-to-face, and a non-clinician who had never seen the patient sent it back to him and said, you need to treat this patient for eight weeks, and this patient is not independent. That's how he would have access to those forms. So that would be routed at some point through the billing department? Well, to these coders who were an arm of the billing department, right? They were making coding decisions. Is the relevant analysis access to the billing records or to the department that's responsible for billing? I think the relevant analysis is access to the information that would allow you to allege specific false claims. I think what's important is that our clients and the relators in churches did not have access to the billing information. That treatment forms which say a particular patient has a condition or a particular patient needs a particular therapy are not the bills. So one way of looking at churches in some of these other cases is that what we want to do is prevent the cutting off of SCA claims based on how an organization, a federal contractor, is organized. That's part of it, yes. I mean, I think that's the ultimate risk, right, is if you do not allow relators to plead this way, you will allow particularly nefarious defendants to structure. But in answer to these questions, both in the first instance and relating to the possibility of amendment, I don't hear from you an answer that the billing department or the company, the medicines, was organized in a way to prevent individuals who might have information from seeing or obtaining or having a sense of how the company was billing the government. I think the answer to that question is we don't know. Well, if the answer is you don't know, then how do you amend on a good faith basis? Clearly you've gotten some questions that seem open. They're only questions to the possibility of amendment. I think the error from the court below was based on a misapprehension of the facts in the case. I don't think it was an apprehension. A misunderstanding that the reference to forms was actually medical forms or treatment forms and not billing forms. Right. So let me see if I understand. A subset of your claims is that the false billing was not that the bills went in and billed for treatment that never happened. It's that the treatment happened, but it wasn't medically necessary. It was either more than was necessary or it wasn't medically necessary at all. And your client was able to discern that people were getting treatment they didn't need from the medical records that he had access to that he drew upon in drafting the complaint. What he doesn't have access to is the actual bills reflecting that the government was billed for those unnecessary services, and that's the court's inference that you're asking us to draw. That's precisely correct. One more question that we've kept you, as we like to say, well past your time, but you do have some time for rebuttal. Does the issue of the billing records and access to the billing records, is that related, so to speak, to the retaliation claim? And if so, how? No. The issue of whether or not our clients had access to the billing information is not tied to the retaliation claim. So protected activity, if there's protected activity, regardless of access to the billing department, then you're fired, whatever, for that. Then that's enough. That's precisely correct. Yeah. Our relators allege that they were terminated as a result of having reported conduct that resulted in violations of the False Claims Act. I'm sorry, I did say one more question. Actually, one housekeeping question with respect to the state law. Yes. So as I see it, you've only really argued those in a footnote, is that correct? You've only challenged those in a footnote in your brief. No, I don't think that's correct. So one rebuttal, I'm going to ask you to show us where in the body of your brief you challenged the state law claims. Okay. Or the dismissal of those claims. Okay. Thank you so much. Thank you. We'll hear from your friend on the other side. For amethyst. Good morning. Good morning, Your Honors. Rajiv Matreja for amethyst. It may please the Court. Your Honors, this Court in Chorchus was explicit that a relator who can allege false claims with specificity must do so. And I think the questions from the Court so far this morning have put finger right on it that this complaint lacks what Chorchus requires, which are specific reasons, specific factual allegations, illustrating that the billing details that are missing from this complaint were, in fact, inaccessible to the relators. As Chorchus puts it, if you have avenues to obtain this information, you have to put it in your complaint. And in Chorchus, the Court found that exception to be satisfied because the missing details were, quote, through no fault or lack of diligence on the part of the relators. And what's alleged in this complaint, paragraphs 154 and 155, does not lay out any specific factual allegations to support the finding that the exception can apply. I'm puzzled by that. I mean, presumably there's either a file cabinet or, I'm guessing, a computer system, and certain universe of people has access to the billing information. They've said, we don't. What more can they say? Do they have to describe the password protection on the system and the fact? I mean, they've said they don't have access. Do you have reason to think they do? I don't know, Your Honor. It's not in the complaint. It's certainly not in the complaint. Even what you're describing right now, Your Honor, is not in the complaint, where all that is alleged is that the billing department was independent and operated quietly, whatever that means, and is in various parts of the country. What's not even alleged here with specificity is that those are parts different from, you know, New York, where the relators are. But separate from that, what's not alleged is any sort of inability to actually gain access to that information. So, you know, an allegation of password protection or some sort of inaccessibility, if that's alleged with specificity, perhaps that would be enough. I don't know, but that's not here, and that's a different case as a result. I think what's striking about this complaint is how it says nothing concrete about the inaccessibility. And so if this complaint were enough to satisfy- Does it say that they couldn't access that? I mean, you said it's not with specificity, but where are you reading it as saying generally that they don't have access? So I think where I would get that from is merely the legal conclusion in the last sentence of 155 in the complaint, paragraph 155. But that's a legal conclusion. I mean, it can't be that any time you make the allegation of the conclusion that it's peculiarly within the defendant's knowledge that the inference is available that they didn't have access. That would be every case, right? 100 percent right, Your Honor. You would think you would see at least, I mean, maybe it would be too generalized, but you would think you'd start with that they couldn't access it, and then try to support that with what you have. And I don't see that. Nor do I, Your Honor, and I think the contrast- I'm just going to disagree with you on that. Can I shift into a different focus? There's two parts to this court's test. There's the access, and then there's sort of the specific examples. And I'm wondering whether your focus on the access is an implicit concession that this other piece could satisfy, which is that second part. And I've got, I see at least 11 allegations that specifically describe patients who were coded as needing treatment that they didn't need, and he was directed to continue treatment that they didn't need. Is that enough, and if not, what more do you need with respect to those examples to satisfy the second prong of court use? Sure, Your Honor. It certainly is not any sort of implicit concession on our part, or not intended as such. Both parts of the exception are required, either as an independent basis for the exception not to apply, and an independent basis for the court to affirm. The district court found both parts of the exception weren't satisfied. But insofar as the handful of specific allegations that I think Your Honor is referring to that do mention some specific patients, there are a few issues with that as to why those don't give rise to a strong inference of fraud. And I think, again, a contrast with Chorch's is helpful, where in Chorch's what you had was a theory where forms were being falsified. That's not quite what we have here. I think what we have here are disagreements between the relators and emeticists over what the appropriate course of treatment was. And what's missing from this complaint are any allegations that the physician certifications that are necessary were absent or compromised. But that seems like it's sideways to the argument that's being made, which is that, I mean, maybe an inference is available that this is just a disagreement about what is proper treatment. But certainly the inference is available based on these allegations that there was being that in the face of the treating therapist saying they don't need more because they're not homebound, they're independent, there was an overruling of that to provide treatment that wasn't needed. And that's what went in the forms, and that's presumably where the overbilling came from. Not that the physician didn't certify consistent with the information that was being relayed to the physician, right? Well, the physician certification needs to have been independent, and there's some talk in counsel's brief about how those certifications were sometimes based on false information. I don't see that anywhere in the complaint. And so, Your Honor, in response to your question, I do think the independent certifications are critical because they are what show this to be at most perhaps a reasonable disagreement over what appropriate care was. And the Eleventh Circuit in the Acera Care case, for example, has held that those sorts of disagreements are not in the realm of fraud, right? And that's a far cry from torches where you had direct falsification of forms. And so I do think the physician certifications are critical there. Even with respect to the question of whether someone was homebound in a particular case, that's a legal conclusion, right? Whether someone is homebound is a term of art that is defined in the statute, and the answer to that is not simply can this person leave the home. The question turns on whether you can leave the home independently or if you need some assistance. How often do you leave the home? You could leave your home every day and still be homebound under the statute if you're going for medical appointments. If there's an instruction to a provider not to chart the fact that someone was in a car accident because it might then disclose that she was out driving a car, doesn't that support an inference that it wasn't simply a good faith disagreement about whether her level of mobility was consistent with being homebound? That seems like some sort of consciousness of guilt to me. Respectfully, Your Honor, I disagree because, again, a doctor did certify. But that kind of immunizes? You have a doctor certification. Therefore, even if it's an available inference that it was made up by the provider what they needed? So I don't think it's an absolute immunity, so to speak. There are circumstances, for example, if it becomes apparent that even though they were certified they really aren't homebound, right? But I think what you need then are specific allegations in a complaint to illustrate that the process didn't work. And I don't think we have that sort of specificity. Well, take the one that Judge Robinson just raised. So say you fell rather than had a car accident because if you had a car accident it would show that you're out and about. I mean, doesn't that fit under the FCA, which says make, use, or cause to be made a false record? Isn't that information that would cause to make a false record? Isn't that an available inference on those allegations? So even if that were plausible, Your Honor, I don't believe that would be a strong inference of fraud. Again, if we look at Church's, which had very specific allegations of falsification and in great volume, the court emphasized there that what it was dealing with were not merely general or conclusory assertions of fraud. And what we're talking about right now is a single fact that I don't think has around it the scaffolding that would support the inference that what actually was happening here, that there's a strong inference of fraud there. Because again, of not only the certifications, but the fact that whether someone is homebound is a term of art. Except that might make sense if what happened is the provider gave an opinion, the physical therapist, the relator, gave an opinion, wrote a note, and then some other clinical person had a different view, and then the company followed one view. But when you have allegations that Maniscalco was instructed by supervisors and coding specialists to write down that he was not independent and needed assistance to get up and downstairs when that provider's own good faith assessment was to the contrary. It's not usual medical practice to force someone else to document your view if you have a different view, right? So the notion that this is just different views of how to classify somebody would make sense if they weren't actually doctoring or pun intended, the records of the physical therapist himself. But what's missing from the complaint is any sort of engagement with the doctor certification process. Mr. Maniscalco or even others at Emeticist, they're not the ones who are certifying or even recertifying. Right, so my impression is that what happened, there's not a physician who sort of re-examines each person with each certification. They get some, used to be faxed probably, a digital transmission now to the doc saying, we think he needs six more weeks, and then the doc signs it, right? Is that, I mean, that's probably how it works. Are you saying that as long as that doc is independent and has signed it, even if the representation that they need six more weeks is patently false based on the only clinicians from the company that have evaluated the patient, that that couldn't lead to a false claim in billing for those services because a doctor had signed off? Well, so what would be required there, so what you're describing I think could support a theory of fraud with legs if the doctor was simply rubber stamping something that was coming from Emeticist. What's alleged in this complaint, however, is exactly the opposite. Where there are specific allegations in the complaint, paragraph 78 and 79, for example, that show that what doctors were doing was exercising independent judgment. The only two examples in this complaint of the doctor certification process are allegations of doctors declining to certify because their opinion was different from that of what came to them. And so, although Judge Robinson, I do think you've set out what perhaps could support some theory of fraud, that's not what's in this complaint. And the allegations that would be necessary would need to actually show the doctor certification process being compromised or tainted in some way. And those allegations just aren't here. But- Can we turn to, actually, two things maybe. You've heard our questions about amendment and maybe the sub-question is, can you explain to me then who has access to the building records, under what circumstances, just as a matter of fact and how Emeticist is organized. If I am in the position of either one of the relators or anybody, can I access the building records? And if so, how? Your Honor, in all candor, I don't know the answer to that question and I don't want to give you the wrong question. I appreciate the importance of that question. I do, but what's equally important- Understanding that this is a motion to dismiss, I'm just interested. Understood, but what's equally important, Your Honor, is that the answer to that question be in the complaint and it's not. And so far as leave to amend is concerned, I think this court's decision in the Lattice case all but controls this one and requires the district court's decision to not grant leave to amend to be affirmed. The arguments that we've been talking about here and that are in the papers about the first part, as well as the second part of the Chorch's test, were in our initial motion to dismiss in the district court, and the relators amended their complaint in response to those arguments, specifically said they were amending their complaint in response to those arguments. We made the same arguments again in very similar form and those arguments prevailed. And because the relators had a chance to lay out their case in response to what we said in their complaint and failed to do so, the district court's decision that they weren't entitled to another bite at the apple was well within the court's discretion. The argument, aha, the relator describes having gotten forms back, that means they do have access to the billing records. Was that an argument you made in the motion to dismiss? Your Honor, I can't recall if that precise point was in our opening brief, but what was in our opening brief in our first motion to dismiss, the one the district court didn't decide, was that the relators failed to satisfy the first part of the Chorch's exception, as well as the second part. And so what the relator then, what the relators laid out in their complaint was their attempt to address that argument. And, you know, I think it's notable that on this issue, this isn't an issue that really requires any sort of investigation, I wouldn't think, on the relator's part. The question of what diligence they exercised, what's available to them, is one that, you know, they should be able to answer just based on what they have. And so I think it's telling that what is in the complaint is quite thin, and although they allege independence, they don't allege inaccessibility. And that's a key difference, because whether you possess the records is fundamentally different from whether you can obtain them. And what matters is the latter under Chorch's. So I think, again, Lattice controls the decision. But you agree, just, well, let me ask you, do you agree that it becomes problematic if an organization, a company, organizes itself in a way to make it impossible for anyone else besides executive officers or officers and the members of the billing department to access the billing records? I don't know that I would agree that that's independently problematic, Your Honor. But if that is what's happened in an organization, that's exactly why the first part of Chorch's, that's why the Chorch's exception exists. If there is a situation where it's, as Chorch has said, virtually impossible for a relator to get information, it makes sense to not hold that against the relator. But that's not what we have here, and certainly not what is alleged in the complaint. Okay. Just the same question Judge Lillie asked her colleague, retaliation, the inability to access records or being within the particular control of your client, that doesn't interplay or does it with the retaliation claim? Not in the same way, Your Honor. I agree with that. Retaliation is a little bit different, obviously. But the problems, I think, are similar in that this complaint is quite thin and doesn't allege any specific facts to give rise to an inference of protected conduct. So protected conduct here would be needing to be conduct either in furtherance of an action under the False Claims Act or an effort to stop one or more violations of the False Claims Act. And I think if you look at what's in the complaint, and it's really just six or so allegations, about three for each relator, I don't think that that actually alleges with specificity protected conduct. So in the context of the case we were talking about earlier in Paragraph 137A, we've got the allegation that after the second recertification, Relator Maniscalco refused instructions by his supervisors to recertify a third time, insisting that she was completely independent and it would be unethical to do so. Isn't that squarely a refusal to engage in the conduct that would constitute or lead to the false claim? The reason I don't think that's right, Your Honor, and that's because Mr. Maniscalco could not himself recertify. He could have an opinion on that, but it's a doctor who has to recertify. And what does the doctor rely on in deciding whether to recertify? The doctor would rely on the patient's file, might see the patient. There's no allegations about that, though. So if that conversation happens and then the supervisor says, okay, then you're fired. No, that's not a plausible allegation of retaliation. That the supervisor says to Mr. Maniscalco that you are. So exactly the same as alleged, I refuse to recertify, it would be unethical. Supervisor says, okay, then you're fired. Is that a plausible allegation of retaliation?  Maybe there's other things out there, other types of retaliation that could apply, but it's not retaliation of the False Claims Act, which is what we're dealing with here. Because for the False Claims Act, it has to be an attempt by the relator to stop a violation of the False Claims Act. And when the doctor certification process is independent, that actually, what Mr. Maniscalco describes here doesn't engage with that at all, and I don't think it supports the inference that it was trying to stop a violation. I think the first- So when you say stop a violation, you mean a billing misrepresentation, is that correct? It would ultimately, I don't think that the efforts need to engage so directly here. So I think on this point, I do think the physicians are- The reason I ask the question, and I'm sorry to interrupt you, is because you seem to say that this is really in the patient care bucket and that's the dispute. But if it relates in any way, shape, or form that is at any juncture to billing, would you agree that that would be potentially, arguably, or adequately alleged as a violation or protected activity under the FCA? It could be, Your Honor. But I think the key point is that you would need reason to think that what the relator- And I think the First Circuit's decision in the Booker case is helpful in illustrating that not all disagreements over medical care rise to the level of fraud. So if what was alleged here were enough, then I think retaliation under the False Claims Act would swallow up all forms of disagreement over medical care. Well, but there's no- I mean, I don't want to recertify her for a third time because I think it would be unethical to do so. If you substituted fraudulent for unethical, is that what you need to get over the hump? Well, that would still be, Your Honor, I think, a legal conclusion. All right. So there would need to be specific facts there. But just to take a- The fact that she doesn't need more care and they keep getting, having the physical therapist send certifications which presumably go to the doctor who then signs off and says, yeah, recertify over and over and over again for care that's not needed. I mean, that's not a, she's not going to get hurt by more physical therapy. The refusal is all about this not being necessary, which is exactly the gravamen of the False Claims Act. Except, Your Honor, that Mr. Maniscalco could not himself recertify. The doctor is who had to recertify. And there's no allegation that the doctor's recertification was tainted. There's two points quickly I want to make on that. No, no, no. Just explain to me how that relates to retaliation. So you're going down a line, a chain, and I've got that. But if I'm fired, regardless of what happens before, or I'm sorry, after, that is by way of a doctor's certification, if I'm fired because I complain early on that I think, let's just say I complain about overbilling, and the doctor disagrees, certifies, is that not at least a basis for a retaliation claim? I think for that to be a basis, Your Honor, I think in broad strokes it sometimes could be. But I think for that to be a basis, Your Honor, what you would need are specific allegations that actually support the inference that something fraudulent was happening. And the doctor's certification, as well as the fact that what we're dealing with is a term of art, whether someone is homebound, that isn't simply answered by whether they could leave the home. I think those put this in the realm. I'm sorry. And maybe I've got training under another statute. But if I believe and if everybody believes that I'm engaged in protected activity, it turns out to be wrong, isn't that still a basis for a claim of retaliation under the FCA? That is, if I believe that there's overbilling and I complain about overbilling, and I turn out to be wrong for whatever reason, but I am terminated or demoted, or there's some other adverse action that results because I've complained about it, isn't that still a form of retaliation under the FCA? I don't believe it's subjective, Your Honor. I do think it has to be objectively reasonable to think that. I agree with you if this is where Your Honor was going, that you don't have to be right necessarily. But it does need to be objectively reasonable, I think. Sure. That's the gist of my question. Right. I agree. Okay. That's right. That's right. I don't disagree with that, Your Honor, but I don't think there are, again, specific allegations, specific factual allegations that actually rise to that level with respect to Mr. Maniscalco, and certainly not with respect to Mr. Pallott, the other relator, where there's nothing close to what we've been describing that's alleged here. Unless there are any further questions, we've kept you all so well past your time. Thank you. Thank you, Your Honor. And we'll hear from your friend on behalf of the relators. Thank you, Your Honor. Very briefly, I wanted to address your question about whether we had addressed the state law claims in our opening brief. We did not. You were correct. We addressed it in a footnote. Okay. I was confused about the reply. Just the housekeeping. Yeah, I appreciate that. I just wanted to first highlight, with respect to some of the questioning we had about whether we had alleged details regarding the inaccessibility of the medical records. And I spoke briefly about context, and I do think there are certain other allegations. For example, paragraph 104, where we describe the remotely stationed coding specialists who are in other parts of the country, not the facility that we worked in, including Illinois and other parts like Louisiana, where headquarters were located. These communications were telephonic in interactions we had remotely with some of these stationed coders. I think that that point supports further some specific details about why we didn't have access to these billing records, which we confirm in the later paragraphs, which we addressed earlier, where we specifically say we did not have access to them. Certainly, if we had other allegations to add to that particular element, we would make them. But the simple fact is true. We did not have access to the billing records. We didn't know where they were processed. We didn't have any interactions with that department other than the coders who were seeking to alter the forms that we submitted. That's a new fact, I think, that you're supporting it with, that they didn't know where they were processed. Can you explain that? Our interactions were with the coders. Our primary interaction, if not exclusive interaction, were with these coders. The coders in the billing department. Who were part of the billing department, but I don't think they were physically sitting in an office with billing employees, right? They were remotely stationed individuals whose specific mission was to figure out ways to enhance reimbursement. So coding and billing are two distinct related but distinct functions, right? That's correct. As I understand it, you get the medical record and somebody looks at the record and says, what codes does this support? And then the billers take that and send in the bills depending on the various insurer's payment policy. That's precisely correct. One other point on this homebound issue and whether we had alleged sufficient specific details regarding it, I think we covered most of this. But I did want to just highlight that Mr. Maniscalco's observations were not just that these individuals were not home. That was certainly part of it. He also observed that they were independent and they were mobile. And so that further supported his allegation that they were not homebound. They were mobile, independent, and they were often not home when he went to treat them at their houses and understood them not to be at religious observances or doctor's appointments, but shopping. Can you speak on the strong inference of fraud prongs? So moving away from the access to the records. So it seems to me you've got, in the example we've been talking about, the 70-year-old woman, there are some specific details that I think would likely lead the defendant to know. Maybe who the person is. I mean, I think you could piece that together. Maybe who the supervisor is. I think you could piece that together. Approximately the time frame, December 2016. And some specificity as to the nature of what you imagine happened in the billing records. I see that one specific example, but then the other ones tend to be more generalized. And I don't think all of that information is available. Maybe there's a 50-year-old who there's some specific. But so let's say you have two. How do you understand Chorch's emphasis on, maybe you disagree with his emphasis, but at least mentioning of the fact that there are, I think, ten or more specific allegations. And here we have one, maybe two, if we assume that for the moment. And then more generalized allegations. In a circumstance in which, if the generalized allegations are true, that information would have been available to your client to make the more specific information. So, I mean, I think as Chorch has pointed, and other cases have as well, there's no mandatory checklist. And I don't think that volume is an indicator of whether something, it could be an indicator of whether there's a strong inference of fraud alleged in a complaint. It's a factor. It's a factor, correct. I do not think that the allegations in Chorch's are that different than those made in this case. In fact, we put one against another in Chorch's, which in fact has more detail. And I think that part of this is how these treatments are conducted. And so one of the things that's identified in the briefing, and I think by the court below, is that there's no specific time identified with regard to the treatment. But these are treatments that happen over time, right? So they happen in eight-week cycles, six-week cycles, right? So what we attempted to do is say this treatment happened in December of 2015, for example, right? So I guess detail for detail, from our perspective, we think we met the specificity requirements that Chorch did. Yes, we did not have ten specific runs. But I'm not sure that necessarily is a preclusion from the analysis under Rule 9B. So I was trying to figure out, I counted seven. But I was trying to figure out whether some of those seven were the same person woven into different allegations. And I don't, can I just quickly ask, just run through? So we've got the summer of 2016, this is paragraph 109. Parkinson's patient ready to be dismissed as outpatient, but the coding specialist said he needed further treatment and was directed to continue treating. Is that person mentioned in any other allegations as far as you know, or is that the only one for that? I think that's the only one for that. Right. Around the same time, Medicare, coder coded Medicare patient sitting with, with sitting to standing ambulation as needing greater care than he actually did. So that's a different patient. Coder not physician drove that determination. That's a different patient from the Parkinson's one that you just talked about in paragraph 109. Correct. And in paragraph 121B, male patient in the summer of 2016 coded as needing moderate assistance when didn't and improperly and unnecessarily recertified three to four times. Is that a different patient from- 110 and 121B are the same patient. Okay, thank you. Yeah. All right, that's helpful. And then the same is true for 121C and 137A. 121C and 137A are the same? Correct. Okay. And actually 137B is also the same. And then 137C, that's a new different one? Correct. Okay, thank you. And part of the reason for the overlap was not to try to sort of add more detail or to give the impression more detail, but I think some of these patients, their conditions and their treatments were manipulated in different ways. So, for example, they were identified as requiring more assistance, right, and they were less independent in requiring a longer treatment cycle than they should have received, in addition to not being homebound. So there were some overlap between the two. Let me just ask you one quick question about retaliation. We lost all of our audience while you were doing your rebuttal, but that has nothing to do with you, I think. What is your best allegation with respect to retaliation in this complaint? What is your best allegation or set of allegations? Where would I be those with respect to retaliation? So I think as we earlier identified, it was, first of all, the refusal by Mr. Maniscalco to recertify or to treat a patient based upon a false and fraudulent recertification. Can I just ask, and then please proceed? Yes. Do you then allege that the person was recertified that third time, which that would allow presumably the inference that the billing record reflected that? I think we stop at Mr. Maniscalco refused to treat the patient based on the fraudulent recertification. And your view is that that's enough. And that's enough, right. Because you don't have to have the final overbilling in this case. Correct. And I think actually if you as a relator have a good faith basis for either refusing to treat a patient or for reporting what you perceive as unethical or fraudulent billing procedures, that's sufficient. And as your friend said, there's got to be some level of objective reasonableness. Yes, there is some level of objective reasonableness, correct. And then just to finish the question, paragraphs 160 to 162, I'm sorry, 163. We detail the issues and concerns that were raised. And I think one point that the court below made with respect to paragraph 163, where the director of operations states that in response to complaints that Mr. Maniscalco made, the goal here is to ensure the best possible outcome for reimbursement. I think the court below described this as innocuous, but I think that was taken out of context. It was directly in response to Mr. Maniscalco's complaints that they were treating patients for conditions and billing the government for treatment that were not eligible for reimbursement. Thank you very much. Okay. We'll reserve the decision.